IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LOOKOUT WINDPOWER HOLDING )
COMPANY, LLC, and )
FREESTREAM CAPITAL, LLC, )
)
        Plaintiffs, ) CIVIL ACTION No. 3:2009-cv-104
)
v. ) JUDGE KIM R. GIBSON
EDISON MISSION ENERGY, and )
MISSION WIND PENNSYLVANIA, INC., )
and MISSION WIND PA TWO, INC., )
and MISSION WIND PA THREE, INC., )
and LOOKOUT WINDPOWER, LLC. )
)
        Defendants. )

## MEMORANDUM OPINION AND ORDER

The serene soldiers of clean energy that dot the Western Pennsylvanian landscape with their gently turning blades result in part from complex business transactions such as the ones at issue in this case. The Motion to Dismiss (Doc. No. 10) presently before this Court goes to the contractual dealings that take place in order for a wind farm to become a reality. Defendants' Motion is a partial motion to dismiss in that it requests dismissal of only Counts IV (Quantum Meruit), V (Fraudulent Misrepresentation), VI (Negligent Misrepresentation), and VII (Breach of Fiduciary Duty) of Plaintiffs' Complaint. Because Plaintiffs' Complaint as pleaded does not meet the "facial plausibility" standard of pleading, the Court will grant the Motion to Dismiss without prejudice to Plaintiffs' filing an amended complaint.

I. **JURISDICTION**

This Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties, and the amount in controversy exceeds

1

$75,000.

Defendants treat ¶ 8 of Plaintiffs' Complaint, which asserts that sufficient contacts exist to support the exercise of personal jurisdiction over Defendants, as legal conclusions to which no response is required but deny any allegations contained therein to the extent any response is required. Defendants' Answer, filed after the Motion to Dismiss *sub judice*, contains affirmative defenses but does not raise the defense of lack of personal jurisdiction.[1] Because Defendants did not raise the defense of personal jurisdiction in their pre-answer motion to dismiss, it is deemed waived. *See* Fed. R. Civ. P. 12(h)(1)(A).[2] This Court's exercise of personal jurisdiction over these parties is therefore proper.

Venue is proper pursuant to 28 U.S.C. § 1391(a) because a significant number of the events underlying the claims in this matter occurred in Somerset County, Pennsylvania, which is in the Western District of Pennsylvania.

## II. CHOICE OF LAW

A court exercising diversity jurisdiction "must apply the choice of law rules of the forum state to determine what substantive law will govern." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Pennsylvania's choice of law analysis applies the "significant relationship" test. *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006). However, a choice of law analysis is unnecessary,

---

[1] In their Answer, Defendants "reserve the right to assert additional affirmative defenses." (Ans. 19.) The advisory committee note for Fed. R. Civ. P. 12(h) calls for "[a] party who by motion invites the court to pass upon a threshold defense [to] bring forward all the specified defenses he then has and thus allow the court to do a reasonably complete job." Moreover, Rule 12(h) specifically includes Rule 12(b)(2) as a waivable defense, so whatever additional affirmative defense Defendants reserve the right to assert will not be a defense of personal jurisdiction.

[2] This litigation, involving the exact same parties, began in the Western District of Missouri but was dismissed for lack of personal jurisdiction. *See Lookout Windpower Holding Co., LLC, et al. v. Edison Mission Energy, et al.*, Case No. 5:08-cv-06128, 2009 WL 1033827 (W.D. Mo. April 17, 2009).

2

indeed discouraged, at this point because there is no apparent conflict of law. *Id.* at 73-74. The Third Circuit in *Huber* observed that "[b]efore a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law." *Id.* at 74. Both sides rely primarily on Delaware law.[3] No party has pointed to any relevant difference between Delaware law and that of other jurisdictions, and therefore this appears to be a "false conflict." *See Lucker Mfg., A Unit of Amclyde Engineered Prods. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994) ("Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a "false conflict" and the court need not decide the choice of law issue."). Following the guidance of the Third Circuit, the Court avoids the choice of law question altogether and does not engage in Pennsylvania's choice of law analysis. Since there is no apparent conflict, the Court is free to refer interchangeably to the various bodies of law that may apply. *Huber*, 469 F.3d at 74. However, for the sake of simplicity and expediency, rather than citing law from multiple jurisdictions, the Court focuses on Delaware law since the parties' arguments rely overwhelmingly on caselaw arising out of that jurisdiction.

## III. STANDARD OF REVIEW

Defendants have brought this motion pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Defs.' Mot. 1.) Rule 8, which governs general pleading matters, provides that "[a] pleading that states a claim for relief must contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. For purposes

---

[3] Defendants do provide other jurisdictions' laws in footnotes to show that there is no conflict of law. Plaintiffs "rely primarily on Delaware law given the relationship of the parties to Delaware [but] do not concede that Delaware law is applicable as to all issues in this matter." (Defs.' Br. 3 n.1.)

of Defendants' motion to dismiss, the Court looks at whether Plaintiffs "ha[ve] made factual allegations that state a plausible ground for relief" and assumes those allegations to be true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 St. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Third Circuit in *Fowler* instructed district courts to conduct a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

578 F.3d at 210-11 (citations omitted). The factual content of a facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. The Court is not required to assume the truth of legal conclusions. *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## IV. FACTUAL BACKGROUND

Plaintiff Lookout Windpower Holding Company LLC[4] (hereinafter "Lookout Holding MO")

---

[4] Lookout Windpower Holding Company, a Missouri limited liability corporation, is one of the plaintiffs in this case. Lookout Holding PA is not a named plaintiff in this matter. Defendants are puzzled as to why Lookout Holding MO, and not Lookout Holding PA, is a plaintiff because Defendants insist Lookout Holding PA is the corporate entity that held the 50% interest in Lookout Windpower. (Defs.' Br. 2 n.2.) Indeed, the Operating Agreement contains the representation that the Developer Member "is a Pennsylvania limited liability company." (Compl. Ex. A.) Lookout Holding MO, meanwhile, is the Secured Party in the Security Agreement. (Compl. Ex. C.) Lookout Holding PA is the sole plaintiff in another matter before this Court at Civ. No. 3:10-74 that appears to concern the same underlying facts as this case and that was brought against these same defendants. The effort involved in distinguishing which of the two Lookout Holdings is involved in a particular transaction is significant since Plaintiffs appear to use the two

4

and Defendant Mission Wind Pennsylvania, Inc., (hereinafter "Mission Wind") entered into a business relationship in 2006. (Compl. 2.) The object of this business arrangement was to build a wind farm (hereinafter the "Project") in Somerset, Pennsylvania. (*Id.*)

Lookout Holding MO[5] owned Lookout Windpower LLC[6] (hereinafter "Lookout Windpower") and sold to Mission Wind its 50% interest in Lookout Windpower. (Compl. 2.) Mission Wind was to finance the wind farm project by arranging for loans to Lookout Windpower. (Compl. 3.) On February 3, 2006, Lookout Holding PA and Mission Wind executed the Operating Agreement[7] for Lookout Windpower. (Compl. Ex. A.) Lookout Holding PA was the Developer Member, and Mission Wind was the Investor Member. (*Id.*) The Operating Agreement included a buyout formula for Mission Wind to purchase Lookout Holding PA's remaining 50% interest in Lookout Windpower when construction began. (Compl. 3.) The Operating Agreement also provided that Mission Wind would buy out Lookout Holding PA's interest in two installments. (Compl. ¶ 18.) The Redemption Price (the amount Mission Wind would pay) was to be determined using the Redemption Formula Spreadsheet. (Compl. ¶ 28.) The formula for calculating the Redemption Price was: (i) (Project Base Case Valuation) less (ii) (Sunk Costs) less (iii) (Mandatory Loan Prepayments). (Compl. ¶ 22.)

---

interchangeably, and at times the Complaint and the attached contracts are inconsistent. The relationship between these two corporate entities is not explained in the Complaint in this case.

[5] The Complaint identifies the parties to this transaction as Mission Wind and "plaintiff Lookout Holding" (Compl. 2), which would mean that Lookout Holding MO, as opposed to Lookout PA, sold half of its interest in Lookout Windpower to Mission Wind.

[6] Lookout Windpower LLC is also a named Defendant.

[7] The Operating Agreement is attached to the Complaint. The consideration of a document outside the four corners of the Complaint does not trigger the conversion of the motion to dismiss into a motion for summary judgment. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993) (approving courts' consideration of exhibits attached to a complaint in deciding a motion to dismiss).

Also on March 28, 2007, Lookout Holding MO and Mission Wind executed a Security Agreement. (Compl. Ex. C.) Under the Security Agreement, Mission Wind, the Grantor, provided Lookout Holding MO, the Secured Party, a security interest in the Redemption Price. (*Id.*) As collateral, Mission Wind granted Lookout Holding MO a first priority security interest in 100% of Mission Wind's interest in Lookout Windpower. (*Id.*) Mission Wind subsequently transferred that collateral to Mission Wind Two and Mission Wind Three. (Compl. ¶ 43.) Mission Wind PA Two and Mission Wind PA Three are now the sole members of Lookout Windpower.[8] (*Id.*)

Plaintiffs allege that the Project was ready for construction in December 2006. (Compl. ¶ 29.) At that point, the parties set to work assigning values to the variables in the Redemption Formula Spreadsheet. (Compl. ¶ 34.) In the process of finalizing the Redemption Formula Spreadsheet, Plaintiffs allege that Defendants quoted various costs for the Project that Plaintiffs later found out were misrepresentations. (Compl. ¶ 36.) The alleged misrepresented costs include turbine costs, O&M building costs, internal charges, operating expenses, expected energy sales, line losses, and construction costs. (*Id.*)

On March 28, 2007, Lookout Holding PA[9] and Mission Wind executed a Redemption Agreement[10]. (Compl. Ex. B.) In the Redemption Agreement, the parties agreed on a Redemption Price of $11,507,000, payable in two installments. (Compl. Ex. B.) When the parties signed the

---

[8] Although the Court is required to take as true the facts in Plaintiffs' complaint anyway, Defendants do admit that Mission Wind PA Two and Mission Wind PA Three are the sole members of Lookout Windpower.

[9] The parties to the Redemption Agreement are the Investor Member and Developer Member of the Operating Agreement. Therefore it appears that Lookout Holding PA, not Lookout Holding MO, is a party to the Redemption Agreement.

[10] The Redemption Agreement is attached to the Complaint. See footnote 6, *supra*.

6

Redemption Agreement, Mission Wind paid the first installment of $1,000,000 to Lookout Holding[11] and FreeStream Capital LLC[12]. (Compl. ¶ 44.) The outstanding $10,507,000 "was to be paid within five days of the Project achieving 'Commercial Operation.'" (*Id.*) "Commercial Operation" means "that time when the Project first sold electric capacity or output, or any renewable attributes, green tags or similar renewable electrical credits associated with or produced by the Project or otherwise available to the Project Company other than production of tax credits available under Section 45 of the Code." (Compl. ¶ 45.) Plaintiffs allege they had no further involvement with the Project after March 2007. (Compl. ¶ 47.)

Plaintiffs believe the Project reached Commercial Operation at least by September 12, 2008, and not later than October 20, 2008. (Compl. ¶ 49.) Plaintiffs first demanded payment of the final installment on September 22, 2008. (Compl. ¶ 50.) Defendants responded that the Project was not yet at Commercial Operation. (Compl. ¶ 51.) Plaintiffs made a second demand for final payment on November 10, 2008. (Compl. ¶ 52.) Defendants responded that the Project had reached Commercial Operation. (Compl. ¶ 54.)

Pursuant to the Redemption Agreement, the final installment was subject to reductions for various reasons. (Compl. ¶ 46.) When Defendants acknowledged that the Project had reached Commercial Operation, they informed Plaintiffs that they were reducing the final installment from $10,507,000, to $5,514,460.30. (Compl. ¶ 55.) Defendants explained that they applied reductions

---

[11] The Complaint itself alleges that "plaintiff Lookout Holding" (i.e. Lookout Holding MO) would receive 75% of the first installment. (Compl. ¶ 44.) According to the Redemption Agreement, the distribution of the $1,000,000 payment was to consist of $750,000 to "Lookout Developer Member" (i.e. Lookout Holding PA) (Compl. Ex. B) and $250,000 to FreeStream. (Compl. Ex. B.)

[12] The relationship between Freestream Capital LLC (hereinafter "Freestream") and Lookout Holding MO is not clear from the Complaint. The Complaint only describes Freestream as "a Delaware limited liability company with its members residing in Texas and England." (Compl. ¶ 2.)

7

due to "alleged delays 'primarily attributable' to Plaintiffs." (Compl. ¶ 58.) Defendants later revised the final installment amount to $5,688,435.97. (Compl. ¶ 63.)

Plaintiffs allege that Defendants "fraudulently misrepresented many of the figures they provided for the buyout formula, and made fraudulent statements which induced Plaintiffs to enter into an agreement for the buyout price." (Compl. 3.)

## V. DISCUSSION

### A. Dismissal of Count IV

Plaintiffs claim in Count IV that they supplied Defendants[13] with $19,500,000 worth of development services for which Plaintiffs have not been compensated and are thus entitled to recover in *quantum meruit*. (Compl. ¶¶ 101-108.) Defendants request dismissal of Count IV on the grounds that Plaintiffs cannot recover in *quantum meruit* where express contracts govern the parties' relationships. Defendants argue that this is a "simple contract dispute" (Defs.' Br. 1) and that express contracts, in particular a Development Agreement, include all of the parties' rights and obligations (Defs.' Br. 5-6). Defendants insist that the Development Agreement, referenced within the Operating Agreement and Redemption Agreement but not attached to the Complaint, "governed the provision of development services on the Project" (Defs.' Br. 5) and therefore precludes Plaintiffs' recovery in *quantum meruit*. Plaintiffs do not refer to the Development Agreement at all in Count IV of their Complaint but rather allege that the development services they provided were "at the special insistence and request of Mission Wind, Lookout Windpower, and/or Edison." (Compl. ¶ 102.)

---

[13] For purposes of discussing Count IV, "Defendants" refers only to Mission Wind, Lookout Windpower, and Edison.

8

*Quantum meruit* is a "quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004) (citing *Constr. Sys. Group, Inc. v. The Council of Sea Colony, Phase I*, No. 449, 1994, 2005 WL 622421, at *1 (Del. Sep. 28, 1995)). "Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, Nos. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005). However, alternative pleading may be appropriate under certain circumstances. *See, e.g., Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc.*, 2004 WL 1949300, at *14 (alternative pleading allowed under both unjust enrichment[14] and quasi-contract "when there is doubt as to the enforceability or meaning of the terms of the contract in question").

Defendants argue that Plaintiffs' *quantum meruit* claim is precluded because an express contract already governs the development services. Among all the contracts attached to and mentioned in the pleadings, the best candidate for an express contract governing development services seems to be the Development Agreement. However, the Development Agreement is not contained in the pleadings and is only tangentially described in the Redemption Agreement. (Compl. Ex. B.) The Redemption Agreement provides that "[t]he Redemption Price shall satisfy all obligations of Lookout and/or Investor Member to the Developer Member (i) under the . . .

---

[14] Although alternative pleading rules behave similarly with both *quantum meruit* and unjust enrichment, and the Court does refer to some caselaw on unjust enrichment, the concepts do differ. Whereas "quantum meruit is a principle of restitution arising from a cause of action in quasi-contract . . . [u]njust enrichment is itself a cause of action, usually but not always equitable, based on an unjustified enrichment of one party and resulting impoverishment of another party, in the absence of a remedy at law." *Hynansky v. 1492 Hospitality Group, Inc.*, C.A. No. 06C-03-200-JEB, 2007 WL 2319191, at *2 (Del. Super. Ct. Aug. 15, 2007).

Development Agreement relating to the Project." (Compl. Ex. B ¶ 2.) The Redemption Agreement further provides that "[o]ther than providing requested information, Developer Member [Lookout Holding] shall have no obligation to perform any development services. If Investor Member [Mission Wind] desires to have Developer Member perform any additional development services with respect to the Project, the parties will separately negotiate for such services." (Compl. Ex. B. ¶ 9.)

Not having the opportunity to examine the Development Agreement, the Court is unable to declare that it expressly governs the same subject matter as Plaintiffs' *quantum meruit* claim, or in any way define the obligations it contains. Whereas in *Albert*, it was "undisputed that a written contract existed between the unitholders and the defendants," here the question of whether the Development Agreement encompassed all of the development services cannot be answered because it has not been included in the pleadings. Even if the Development Agreement were attached to the Complaint, it would not necessarily preclude alternative pleading at this early stage in the litigation. *See Eisenmann Corp. v. General Motors Corp.*, 2000 WL 140781, at *14 (Del. Super. Ct. Jan. 28, 2000) (denying motion to dismiss *quantum meruit* claim where "written express contracts [were], at least partially, attached and incorporated into the Complaint" and "for the most part[] govern[ed] the relationship of the parties"). However, as this discussion makes clear, inclusion of the Development Agreement by itself would probably not cure the other serious pleading deficiencies of Count IV.

Count IV is insufficiently pleaded because it consists entirely of legal conclusions. The count amounts to nothing more than a "[t]hreadbare recital[s] of the elements of a cause of action, supported by mere conclusory statements . . . ." *Iqbal*, 129 S.Ct. at 1949. "To prevail on a *quantum*

10

*meruit* claim, a plaintiff must show that it performed services with an expectation that the defendant would pay for them, and that the services were performed under circumstances which should have put the defendant on notice that the performing party expected to be paid by the defendant." *State ex rel. Structa-Bond, Inc. v. Mumford & Miller Concrete, Inc.*, C.A. No. 98C-10-327-JEB, 2002 WL 31101938, at *3 (Del. Super. Ct. Sept. 17, 2002) (citing *Constr. Sys. Group, Inc.*, 2005 WL 622421, at *1). Plaintiffs allege that the $19.5 million in services they provided were at the "special insistence" of Defendants. (Compl. ¶ 102.) This is a legal conclusion aimed at communicating Plaintiffs' expectation that they expected to be paid for the development services Defendants specially insisted upon. Plaintiffs do not identify the "special insistence." They do not indicate what development services they provided at the "special insistence" of Defendants. Plaintiffs' allegations under Count IV contain no mention of the Development Agreement, whether it was an express contract for development services, and if so what development services it covered. (Compl. ¶¶ 101-108.) The express contract itself has yet to make an appearance. Neither side's arguments on this point help illuminate what development services Plaintiffs have valued at almost $20 million. When the legal conclusions of Count IV are disregarded (since they lose their entitlement to the presumption of truth), what is left is a factual vacuum. Although Rule 8's pleading standard "does not require detailed factual allegations . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S.Ct. at 1949 (citations omitted) (internal quotation marks removed). Count IV does not even meet this minimal requirement.

No doubt largely because of its lack of factual content, Count IV also must be dismissed because Plaintiffs have not asserted plausible grounds for relief. Plaintiffs insist their *quantum meruit* claim is "an independent claim based on separate development services provided to

11

Defendants." (Pls.' Br. 5.) That basis for relief is not at all clear, let alone plausible, from the Complaint. Details about the Development Agreement found in the Redemption Agreement do leave open the possibility for the negotiation of further services beyond those provided for in the Development Agreement. *Compare* Compl. Ex. B ¶ 9 (Redemption Agreement's provision that "the parties will separately negotiate for [additional development] services"), *with* Wal-Mart Stores, Inc. v. AIG Life Insur. Co., No. 19875, 2005 WL 5757653, at *5 (Del. Ch. July 27, 2005) (finding that, in addition to the existence of a controlling written contract, "the case for dismissing Wal-Mart's unjust enrichment claim is bolstered by the fact that the written contract contains a merger clause, expressly disavowing that any additional promises or agreements exist between the parties"). However, it is entirely unclear whether the development services referred to in Count IV are beyond the scope of an enforceable express contract (most likely the Development Agreement) because Plaintiffs do not identify them. Plaintiffs' claim to relief is possible, but it is certainly not plausible, and so Count IV is without prejudice to Plaintiffs' filing an amended complaint.

Since, for the reasons set forth above, the Court will dismiss without prejudice Plaintiffs' *quantum meruit* claim, at this point the Court need not reach Plaintiffs' argument that an express contract can only preclude quasi-contract claims against actual parties to the express contract. (*See* Pls.' Br. 6.)

### B. Dismissal of Counts V and VI

Plaintiffs assert both fraudulent (Count V) and negligent (Count VI) misrepresentation claims against Defendants Mission Wind and Edison. According to Plaintiffs, Defendants[15] fraudulently misrepresented "facts regarding the costs and/or revenue projections associated with the Project,"

---

[15] For purposes of discussing Counts V and VI, "Defendants" refers only to Mission Wind and Edison.

and these "false representations were material and relevant to the parties' negotiations regarding the Redemption Price." (Compl. ¶¶ 110, 112.) "Plaintiffs relied on [the false representations] in their decision to enter into the Redemption Agreement, and were induced by such representations to enter into the Redemption Agreement." (Compl. ¶¶ 14-15.) The negligent representation claim states that Defendants' representations to Plaintiffs were false because of Defendants' failure to exercise reasonable care. (Compl. ¶ 122.) Plaintiffs then relied on those representations, which Defendants provided in the context of "a particular business transaction." (Compl. ¶ 123.) Plaintiffs allege $19,500,000 in damages due to the false representations. (Compl. ¶¶ 118, 125.) In addition, for the fraudulent misrepresentation claim, Plaintiffs allege punitive damages. (Compl. ¶ 119.)

Defendants attack the two misrepresentation claims on two grounds. First, Defendants argue that Plaintiffs fail to allege a misrepresentation regarding a past or existing fact but rather base their claims on statements containing predictions and assumptions. (Defs.' Br. 7-9.) Second, Defendants argue the misrepresentation claims must be dismissed for failing to assert a legally cognizable theory of injury. (Defs.' Br. 10-12.) Defendants believe Plaintiffs intend to rescind the Redemption Agreement and recover the buyout amount ($19,500,000) under the Operating Agreement. (Defs.' Br. 11.) According to Defendants, because neither Plaintiff is a party to the Operating Agreement, the amount asserted in damages amounts to an "illusory injury." (Defs.' Br. 12.)

Plaintiffs allege that Defendants made false misrepresentations during "the November 2006 meeting and in subsequent correspondence." (Compl. ¶ 36.) Defendants allegedly misrepresented costs associated with the Project, including turbine costs, O&M building costs, internal charges, operating expenses, expected energy sales, line losses, and construction costs. (*Id.*) To plead fraudulent or negligent misrepresentation, Plaintiffs must allege a misrepresentation relating to a past

13

or existing fact. *See Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) (listing as one of the elements of a *prima facie* case of intentional misrepresentation the "[d]eliberate concealment by the defendant of a material *past or present fact*, or silence in the face of a duty to speak" (emphasis added)). Predictions about the future and expressions of opinion cannot support a common law fraud claim. *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001). Defendants argue that Plaintiffs have failed to allege any misrepresentation regarding a past or existing fact and have only attacked the assumptions that went into calculating the redemption price of $11,507,000. (Defs.' Br. 7-9.) The preliminary question, therefore, is whether the representations Plaintiffs allege relate to facts or predictions and opinions. Because the only identifiable factual allegation of Count V is too anemic to allow the inference of a plausible claim to relief, and Count VI consists entirely of legal conclusions, both counts will be dismissed without prejudice.

The Complaint alleges that Defendants made representations "about various alleged costs." (Compl. ¶ 36.) Then it lists without much specificity the costs to which the representations pertained. In addition, Count V specifies that Defendants made "representations of fact regarding the costs and/or revenue projections." (Compl. ¶ 110.) Since Plaintiffs do not identify the facts that they allege were misrepresented, it is unclear whether their claim rests on future as opposed to existing facts or predictions as opposed to facts. Plaintiffs point out that "whether Defendants 'expressed 'opinions' or outright misleading facts is a question of fact, and cannot be determined on a Motion to Dismiss.'" (Pls.' Br. 8 (citation omitted).) Certainly the motion to dismiss phase does not involve fact-finding, but whatever was allegedly misrepresented, even if it cannot be determined to be opinion or fact on a motion to dismiss, surely must be *included* to some degree in the

14

complaint.[16] To the Court's query as to what about the costs or revenue projections was misrepresented, the Complaint effectively replies, "a fact." This, to the Court, is a good example of an "unadorned" factual recitation that falls short of the relatively undemanding specificity requirement. *See Iqbal*, 129 S.Ct. at 1949. As a result, the Court is unable to find that Count V states a facially plausible claim to relief.

Count VI consists entirely of conclusory statements. For example, the allegation that "[t]he representations were provided intentionally . . ." is a recitation of the intent element of a negligent representation claim. (Compl. ¶ 123.) The allegations of Count VI are conclusory in that they are nothing more than a "formulaic recitation of the elements" and thus are not entitled to the presumption of truth. *Iqbal*, 129 S.Ct. at 1951 (citation omitted) (internal quotation marks omitted). Without more, the allegations in Counts V and VI fail to show a plausible entitlement to relief on these claims.

Lastly, Defendants raise an issue of standing. Defendants assert that Plaintiffs are "[i]n essence . . . seeking rescission of the Redemption Agreement and seeking recovery under the Operating Agreement." (Defs.' Br. 11.) Neither Count V nor Count VI of Plaintiffs' Complaint contains any reference to the Operating Agreement. (Compl. ¶¶ 109-125.) Therefore, on their face the misrepresentation claims do not depend on the identity of the parties to the Operating Agreement.

---

[16] Plaintiffs include within their brief details about the alleged misrepresentations. (Pls.' Br. 8-9.) These details, naturally, of course cannot be considered by the Court in adjudicating the motion to dismiss. Plaintiffs accordingly ask for leave to amend in the event the Court finds a pleading deficiency. As this Memorandum explains, Plaintiffs will be permitted to amend the pleadings that Defendants have moved to dismiss. However, the Court expresses no opinion whatsoever as to whether inclusion of the details Plaintiffs provide in their brief would fill the factual gaps sufficiently to allow the misrepresentation claims to survive another motion to dismiss. Plaintiffs also bring up Rule 9(b) and point out that Defendants have not framed their objection within the context of that rule. (Pls.' Br. 9 n.9.) The Court simply notes that Rule 9(b)'s heightened pleading requirements need not be addressed because the pleadings at issue here do not even meet the requirements of Rule 8.

15

Though a standing issue may ultimately present itself in this litigation, that issue is not before the Court at present.

Counts V and VI, therefore, are dismissed without prejudice to Plaintiffs' amending these claims.

### C. Dismissal of Count VII

In Count VII, Plaintiffs assert a breach of fiduciary duty claim against Defendants Mission Wind and Edison. Plaintiffs allege that they entered into a "business venture" with Mission Wind and Edison. (Compl. ¶ 127.) Plaintiffs then baldly assert that those involved in the business venture owed one another fiduciary duties, presumably as a result of the mere fact that they were involved in a business venture. Plaintiffs allege no facts to describe the venture. They allege no facts to suggest that the business relationship was special or involved trust in any way such that fiduciary duties would arise. A relationship that is fiduciary can not be asserted to exist without at least some minimal substantiation. "Fiduciary relationships have often been described as 'special relationships,' for good reason. Generally, a fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d at 624) (internal quotation marks omitted).

Plaintiffs' fiduciary duty claim contains only legal conclusions. "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 129 S.Ct. at 1941. Because Plaintiffs have alleged no facts whatsoever that support the existence of a fiduciary relationship, it is not plausible on the face of the complaint that a breach of fiduciary duty occurred that entitles Plaintiffs to relief.

## VI. CONCLUSION

Therefore, for the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. No. 10) is **GRANTED**. Counts IV, V, VI, and VII of the Complaint are dismissed without prejudice to Plaintiffs' filing an amended complaint within twenty (20) days with respect to these counts only.

BY THE COURT:

May 17, 2010

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**