# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

LOOKOUT WINDPOWER HOLDING )
COMPANY, LLC, and )
FREESTREAM CAPITAL, LLC, )
                                                   )
       Plaintiffs, )
                                                   )
v. ) CIVIL ACTION NO. 3:2009-cv-104
                                                 )
EDISON MISSION ENERGY, and ) JUDGE KIM R. GIBSON
MISSION WIND PENNSYLVANIA, INC., )
and MISSION WIND PA TWO, INC., )
and MISSION WIND PA THREE, INC., )
and LOOKOUT WINDPOWER, LLC., )
                                                 )
      Defendants. )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. No. 103.) Plaintiffs filed a brief in opposition. (Doc. No. 109.) This Court held a hearing on the motion on August 17, 2010, and now issues this Order enjoining the sale of the secured interest set to take place on August 20, 2010.

### I. JURISDICTION, VENUE, AND CHOICE OF LAW

The Court has jurisdiction over this action pursuant to § 1332 because there is complete diversity among the parties[1], and the amount in controversy exceeds $75,000. Venue is proper in the Western District of Pennsylvania because the wind project that lies at the heart of this case is located in Somerset County, Pennsylvania. The Court has not yet had reason to decide the choice of law for this action as no actual conflict has arisen. The parties indicate that for the

---

[1] It is now the rule in the Third Circuit that, for purposes of establishing diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of each of its members. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).

1

legal arguments they have presented in the motion for TRO/Preliminary Injunction, there exists no conflict among all the possible states whose laws could potentially apply.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Because the Court has previously enumerated in detail the facts underlying this action and will do so further within this Memorandum Opinion, the following brief background of this litigation focuses on the events significant to the motion for TRO/Preliminary Injunction.

On February 3, 2006, Defendant Mission Wind Pennsylvania ("Mission Wind") entered into an Operating Agreement with Lookout Windpower Holding Company, LLC, a Pennsylvania limited liability company, ("Lookout PA") for the construction of the Lookout wind project. (Defs.' Ex. 25.) Mission Wind was the Investor Member, and Lookout PA was the Developer Member. (*Id.*)

On March 28, 2007, Mission Wind and the "Developer Member" signed a Redemption Agreement, under which Mission Wind would redeem Developer Member's interest in the wind project in two installments amounting to a total no more than $11,507,000. (Defs.' Ex. 1.) The Developer Member is identified as Lookout WindPower[2] Holding Company LLC, but the state of incorporation is not specified. (*Id.*) The first installment, which was paid in conjunction with the signing of the Redemption Agreement, consisted of $750,000 to Developer Member and $250,000 to Freestream. (*Id.*) The Final Installment of up to $10,507,000 was subject to reduction for various reasons outlined in ¶ 3(b) of the Redemption Agreement. (*Id.*)

Also on March 28, 2007, Mission Wind and Lookout Windpower Holding Company, LLC, a Missouri limited liability company, ("Lookout MO") signed a Security Agreement. (Defs.' Ex. 2.) Under the Security Agreement, Mission Wind granted Lookout MO a security interest in 100% of its membership interests in the Lookout wind project. (*Id.*) Mission Wind

---

[2] Both "Windpower" and "WindPower" appear throughout the contractual documents in this case.

2

also transferred its membership interests in equal shares to Mission Wind Pennsylvania Two, Inc., ("Mission Wind 2") and Mission Wind Pennsylvania Three, Inc. ("Mission Wind 3").

Defendants gave Plaintiffs notice in late 2008 that they were reducing the Final Installment by approximately $5,000,000. Plaintiffs subsequently filed this law suit alleging, among other claims, that they are entitled to the full Final Installment of $10,507,000 because the Defendants' reductions were improper. On July 13, 2010, Plaintiffs sent Mission Wind a letter declaring a breach of both the Redemption Agreement and the Security Agreement. (Defs.' Ex. 9.) On July 23, 2010, Plaintiffs sent Defendants a notice expressing their intention of foreclosing on Plaintiffs' security interest and selling it to the highest qualified bidder on August 20, 2010, at 11:00 a.m. (Pls.' Ex. J.) Defendants then filed the motion for TRO/Preliminary Injunction that is the subject of this Memorandum Opinion.

## III. DISCUSSION

Federal Rule of Civil Procedure 65(a) allows a court to issue a preliminary injunction. Although Defendants have asked for both a TRO and a preliminary injunction (Doc. No. 103), the Court limits its discussion to the preliminary injunction, since that was the focus of the August 17, 2010, hearing and a preliminary injunction obviates the need for a TRO.

### A. Preliminary Injunction/TRO Factors

In considering whether to grant a preliminary injunction under Rule 65, the Court considers the following factors that the moving party has the burden of establishing:

(1) whether the movant will be irreparably injured if relief is denied;
(2) whether the movant has shown a reasonable probability of success on the merits;
(3) whether granting the preliminary relief will result in greater harm to the nonmoving party;
(4) whether granting the preliminary relief will be in the public interest.

3

*Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998).[3] The Third Circuit has further explained that "[w]hile these factors structure the inquiry, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements." *Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978). The Court addresses each factor in turn and, on balance, finds that a preliminary injunction is appropriate.

### 1. Irreparable Harm

Defendants assert they will suffer irreparable harm to their reputation if their wind project is subject to foreclosure. Plaintiffs counter that Edison Mission Energy ("Edison") cannot assert reputational harm because the entities that own the assets which comprise Plaintiffs' security interest are Mission Wind 2 and Mission Wind 3. Plaintiffs further argue that Defendants already have a poor reputation among Pennsylvania developers and have also suffered a blow to their reputation in the form of a fine imposed by the Federal Energy Regulatory Commission (FERC) (Pls.' Ex. 240).

The Court does not find persuasive Plaintiffs' argument that only Mission Wind 2 and Mission Wind 3 can suffer reputational harm. Edison wholly owns Mission Wind, which wholly owns Mission Wind 2 and Mission Wind 3. The Court credits the testimony of Randolph Mann, Vice President of Wind Development at Edison, that any reputational harm to Mission Wind 2 or Mission Wind 3 would impact Edison's reputation in the wind power industry just as strongly. The Court further finds persuasive Mr. Mann's testimony that a foreclosure is a "black mark" to Edison's reputation. It is difficult to imagine a more severe impact to a business' reputation than

---

[3] Plaintiffs have cited a District of New Mexico case for the proper standard for issuing a preliminary injunction. (Pls.' Br. 25.) That case, *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 633 F.Supp.2d 1257, 1268 (D.N.M. 2008), cites Tenth Circuit cases. The language of the Tenth Circuit does not differ significantly from that of the Third Circuit. The only difference the Court can identify is that where the Third Circuit says "reasonable probability," the Tenth Circuit says "substantial likelihood." This difference, in the Court's view, is minimal. In any event, because this is a procedural issue arising in the Western District of Pennsylvania, the Court will apply the standard of the Third Circuit.

4

a foreclosure. The FERC fine surely has some impact on Edison's reputation but is not sufficiently damaging to alter the Court's finding that a foreclosure would dwarf whatever reputational harm Edison is suffering as a result of the instant litigation or the FERC fine.

Therefore, the Court finds that Defendants have shown they will suffer irreparable harm as a result of the proposed sale. This weighs in favor of a preliminary injunction.

### 2. Reasonable Probability of Success

Plaintiffs argue that Defendants cannot possibly establish a reasonable probability of success on the merits because they have already admitted that they owe approximately $5.6 million as a Final Installment payment and therefore Plaintiffs will obtain a verdict for some amount. Defendants, on the other hand, admit only that they owe money in an amount substantially less than the claimed full Final Installment payment of $10,507,000 to some party, be that Plaintiffs or a bankruptcy trustee in Kansas asserting a claim[4] to the Final Installment under the Redemption Agreement. (Defs.' Ex. 12.) Therefore, Defendants measure success as not having to pay *these* Plaintiffs, since Defendants are concerned about double payment. Defendants also see a payment of closer to $5.6 million, rather than $10.5 million, as a success on the merits.

The parties are measuring success on the merits in different terms. In the Court's view, success on the merits in this case cannot be determined solely based on the party in whose favor judgment would be entered. The Court finds that recovery by Plaintiffs of a Final Installment payment in an amount substantially less than the claimed $10.5 million would constitute success on the merits by Defendants. Since an undetermined amount of money is indisputably owed to some entity, Defendants could be successful in a couple of ways. First, Defendants could prove

---

[4] Eric C. Rajala, bankruptcy trustee for Generation Resources Holding Company, LLC, filed an action in the United States District Court for the District of Kansas on September 1, 2009. The caption for that case is *Eric C. Rajala v. Robert H. Gardner et al.*, Case No. 2:09-cv-02482-EFM.

5

that the reductions they took out of the Redemption Price were proper. This could result in the claim being reduced by an amount as large as $4.9 million. Of course, the Court has not yet reached the merits of the disputed amount, but from all the evidence that has been presented thus far it appears Defendants do have a reasonable probability of success on the underlying cause of action. The second way Defendants could succeed as to these Plaintiffs is if the bankruptcy court in Kansas were to determine that the Redemption Price claim belongs to the Generation Resources Holding Company bankruptcy estate, which could result in Plaintiffs recovering nothing from Defendants.

The Court therefore finds that Defendants have a reasonable probability of success on the merits that weighs in favor of a preliminary injunction.

### 3. Harm to the nonmoving party

The only harm to Plaintiffs that the Court can identify is that Plaintiffs will have to continue waiting to be paid the Final Installment (assuming, of course, they are owed the Final Installment). The Court will require Defendants to post a bond. *See Zambelli*, 592 F.3d at 426 (explaining that bond waiver under Rule 65(c) is "rare"). The bond that Defendants will be required to post should assure Plaintiffs that, if they are ultimately successful, they will indeed be paid.

Therefore, the Court finds that the assurance of a bond sufficiently alleviates any harm to Plaintiffs caused by a preliminary injunction. This finding weighs in favor of a preliminary injunction.

### 4. Public Interest

The Court cannot identify any aspect of a preliminary injunction in this case that would impact either positively or negatively the public interest.

## B. **The validity of default**

Although the Court has determined that a preliminary injunction is necessary, the Court notes that Defendants also attack the validity of Plaintiffs' declaration of a default. If the declaration of default is found not to have been valid, then that finding would provide another basis for preventing the sale scheduled for August 20, 2010. A large portion of the August 17, 2010, hearing related to the question of whether Plaintiffs' declaration of default was valid, and in the following discussion the Court addresses the arguments raised.

### 1. Corporate Capacity

As one of their primary arguments regarding the invalidity of the declaration of default, Defendants raise the lack of clarity that has surrounded Plaintiffs' corporate identity for the duration of this litigation, a situation which recently led the Court to deny without prejudice Plaintiffs' motion for partial summary judgment because the structure of Lookout MO continued to undergo revisions.[5] Defendants question Plaintiffs' ability to declare a default under the Redemption Agreement since the Redemption Agreement, although it does not specify which Lookout entity is a party, does refer to the Developer Member, which was Lookout PA under the Operating Agreement. Plaintiffs respond that the Redemption Agreement was executed simultaneously as the Security Agreement, which does name Lookout MO and inferentially equates the Secured Party with the Developer Member. On August 6, 2010, Lookout PA and

---

[5] For example, on March 27, 2009, Robert Gardner, in an affidavit, said that Lookout PA switched to Lookout MO. Then in a second affidavit dated August 13, 2009, Robert Gardner said that Lookout PA was administratively dissolved when Lookout MO was formed. Gardner, in a third affidavit dated March 5, 2010, explained that Lookout PA was not administratively dissolved but merely transferred all of its rights and interests to Lookout MO. A week after the third affidavit, Lookout PA, no longer dissolved, filed a lawsuit in this Court. The Court recently allowed Plaintiffs to substitute the third affidavit for a prior affidavit in their motion for partial summary judgment. On July 30, 2010, Plaintiffs filed a supplemental brief that included a supplemental concise statement of material facts well after Defendants had already responded to Plaintiffs' original concise statement of material facts. By August 10, 2010, Plaintiffs' motion for partial summary judgment, with all of its supplements and additions, varied in significant respects from its first iteration. In addition, Local Civil Rule 56.C requires the party opposing summary judgment to respond to the movant's concise statement of material facts. The Court therefore determined that a single, all-inclusive list of undisputed material facts would facilitate an accurate response from the nonmovant and render considerably easier the Court's identification of disputed issues.

7

Lookout MO merged, with Lookout MO as the surviving entity.[6] (Pls.' Ex. R.) Plaintiffs do not concede that there ever was an issue that needed to be resolved with respect to Lookout MO's capacity to enforce all agreements in this matter and view the very existence of this dispute as "outrageous" (Defs.' Br. 19), but they felt this merger would "put this issue to rest" (Defs.' Br. 17).[7]

The Court finds that, for purposes of the preliminary injunction motion, there no longer appears to be a corporate capacity issue because of the recent merger. This finding is limited in scope to the analysis of the preliminary injunction motion only. The Court is not at this stage making findings with regard to this issue as it affects any other motions in this case.

Defendants' argument with regard to Lookout MO's ability to declare default may have merit because the merger of Lookout PA and Lookout MO was not effective until after the declaration of default. However, the Court has already determined that the sale of the security interest shall not go forward, and it does not appear that Defendants have specifically requested alternative relief based solely on the grounds that the declaration was invalid since it preceded the merger. Rather, they have only asserted this as part of one factor in the analysis of whether a

---

[6] The Lookout PA lawsuit in this Court was dismissed without prejudice at the request of the parties on August 5, 2010.

[7] Plaintiffs see "no ambiguity" in the capacity of Lookout MO to take the place of Lookout PA in the operating agreement and view the issue as a "name-game defense." (Defs.' Br. 19.) Plaintiffs' attitude toward this dispute ignores the record in this case and even the hearing testimony of its main witness Robert Gardner, who repeatedly admitted his confusion over his own place in the corporate structure. The Court has shared this confusion for some time, as evidenced by its recent ruling that Plaintiffs' motion for partial summary judgment be dismissed and perhaps filed in a more digestible form *sans* substitutions and supplementations. This case involves complex, multi-million dollar contracts. The difference in names from contract to contract, coupled with Plaintiffs' assertion these are all the same entity, is an issue properly raised by Defendants, particularly given the fact that this is in large part a contract case. The Court has never viewed the corporate identity issue as a "name game" or any type of "game" at all. The Court has undertaken its inquiry into this matter seriously and given it the attention that such a fundamental contract issue, and the parties themselves, deserve.

preliminary injunction should issue. Therefore, it is not incumbent on the Court to make any finding as to the validity of the declaration of default.[8]

### 2. Estoppel Certificate

Another point Defendants raise in support of their argument that no breach could have been declared has to do with the requirement of an estoppel certificate. The Redemption Agreement provides that the Investor Member shall pay the Redemption Price "as and when required by this Agreement" (i.e. in two installments) "[p]rovided Developer Member has delivered a fully-executed estoppel certificate . . . which shall be a condition to any payments hereunder . . . ." (Defs.' Ex. 1 ¶ 3.)

Defendants contend that, even if these Plaintiffs are able to enforce the Redemption Agreement, Defendants' obligation to pay the Final Installment was never triggered because Plaintiffs never issued an estoppel certificate. The Court is unable to follow the logic of this argument. The party that issues an estoppel certificate "consents to the proposed transaction" and "waives, relinquishes and releases any and all claims it may have for any reason, in law or equity, . . . arising from, as a result of or in connection with (i) the Proposed Transaction." (Defs.' Ex. 1 Ex. B.) As Defendants are well aware, there is a dispute in this case as to the amount of the Final Installment. It would only be reasonable to expect Plaintiffs to issue an estoppel certificate if Plaintiffs did not dispute the amount of the Final Installment. If the Court were to adopt Defendants' view of the estoppel certificate, then Defendants would forever be insulated from default because no estoppel certificate would ever issue in the event of a dispute, and no default could occur because Defendants' obligation could not have been triggered. Furthermore, an issuer of an estoppel certificate could never declare default anyway because the

---

[8] The Court merely observes that the timing of the merger could provide an alternative basis for stopping the sale. Of course, if that were the only reason for stopping the sale, it appears that Plaintiffs could declare default again and proceed with a sale on an alternative future date.

9

issuer waives all claims in the estoppel certificate. Defendants' argument with regard to the effect of the estoppel certificate requirement as it pertains to the July 2010 declaration of default is without merit.

Since the Court has found a preliminary injunction to be appropriate, the non-issuance of an estoppel certificate does not affect the Court's determination to enjoin the sale, and therefore the Court declines to reach the issue of how and when an estoppel certificate must issue.

### IV. CONCLUSION

On balance, the Court finds that Defendants have met their burden of showing the necessity of injunctive relief in the form of a preliminary injunction and that the factors the Court has considered weigh in favor of a preliminary injunction. Therefore, **IT IS HEREBY ORDERED** that Defendant's motion (Doc. No. 103) is **GRANTED IN PART** (as to the preliminary injunction) and **DENIED IN PART** (as to the TRO). Pursuant to Rule 65(a), **IT IS HEREBY ORDERED** that a preliminary injunction is issued enjoining the sale of Plaintiffs' security interest in the Lookout wind project. This injunction shall apply to the parties, the parties' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of these individuals. This injunction does not in any way affect the claims or defenses Plaintiffs may assert in this cause of action. **IT IS FURTHER ORDERED** that Defendants shall post a bond of $10,507,000 within fourteen (14) days of the date of this Order. This preliminary injunction is effective immediately and in no way depends upon the bond being posted prior to the time of the proposed sale.

BY THE COURT:

**August 19, 2010**

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**